UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MARK CANADY,

                                Plaintiff,

                                                                <u>DECISION AND ORDER</u>

                                                                13-CV-6290L

                                v.

UNION 1199,
UNIVERSITY OF ROCHESTER,

                                Defendants.
_____

MARK CANADY,

                                Plaintiff,

                                v.                                           14-CV-6264L

1199 EAST HEALTHCARE WORKERS SEIU,
UNIVERSITY OF ROCHESTER,

                                Defendants.
_____

MARK CANADY,

                                Plaintiff,

                                v.                                           15-CV-6285L

U OF R,

                                Defendant.
_____

Plaintiff Mark Canady ("plaintiff") brings two actions (13-CV-6290 and 14-CV-6264, which have been consolidated) ("the 2013 consolidated case") against the University of Rochester (the "University") and 1199 SEIU Healthcare Workers East (the "Union"), and a third action (15-CV-6285) (the "2015 case") against the University alone, alleging that the defendants subjected him to race-based discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") and the New York Human Rights Law, N.Y. Exec. Law §290 et seq. ("NYHRL").

The defendants have filed motions for summary judgment seeking dismissal of the complaints in each of plaintiff's pending cases against them (13-CV-6290, Dkt. #55 and #56; 15-CV-6285, Dkt. #25). For the reasons that follow, all three motions are granted, and the complaints in each matter are dismissed.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

Familiarity with the underlying facts, summarized here, is presumed.

Plaintiff, who is of African-American descent, was initially hired by the University in 2008 as a Perioperative Support Associate ("PSA") at Strong Memorial Hospital. Among other

---

1 In plaintiff's submissions, without elaboration, he mentioned that this Court did preside over criminal matters involving the plaintiff. Without further elaboration, plaintiff asked the Court to recuse itself (13-CV-6290, Dkt. #65 at 5). The motion for recusal is denied. Plaintiff points to no evidence of bias and makes no attempt to explain how the Court's involvement in criminal proceedings many years ago would affect the Court's views on the present motions.

The Court has no clear recollection of the prior matters, but a review of the docket sheets shows that defendant did have a criminal drug conviction in 1994, twenty-three years ago, before this Court and a subsequent drug conviction before this Court in an indictment filed fifteen years ago. In that case, the most recent matter was an Order of March 25, 2008 GRANTING plaintiff's motion for a sentence reduction.

In light of the above, I do not believe a "reasonable person, knowing all the facts, would conclude that the Court's impartiality might reasonably be questioned." *United States v. Terry*, 802 F.Supp. 1095, 1098 (S.D.N.Y. 1992). The issues in the instant civil cases are completely different from those long-ago criminal matters.

things, PSAs assist clinical staff with the cleaning and preparation of surgical rooms and the transport of patients.

It is undisputed that plaintiff's employment as a PSA was peppered with disciplinary warnings and periodic meetings between plaintiff and his supervisors concerning allegations of unprofessional and inappropriate workplace behavior by plaintiff toward his coworkers. These included: (1) a February 7, 2011 counseling memorandum to plaintiff from the University, concerning a comment by plaintiff that a coworker believed to be threatening; (2) a March 23, 2011 meeting with plaintiff concerning complaints by two female staff members that plaintiff had made inappropriate comments toward them; (3) a March 30, 2012 meeting concerning allegedly inappropriate comments made by plaintiff to a student employee; (4) a May 10, 2012 written warning concerning plaintiff's failure to sign in and out for his break, and abrasive and/or insubordinate conduct toward coworkers who requested assistance with moving equipment; (5) discussions concerning a July 20, 2012 altercation with a nurse in which plaintiff refused to respond to inquiries about the status of a surgical room and yelled, "don't harass me, you liar"; and (6) a November 19, 2012 five-day suspension after one coworker complained that plaintiff was repeatedly subjecting her to unwanted advances even after she asked him to stop, and a second coworker complained that plaintiff was lurking in certain areas of the hospital and waiting for her, asking invasive questions about her husband, and responding aggressively when she asked him not to touch her. Plaintiff grieved the November 2012 five-day suspension, and the Union and University resolved that grievance via a written "Final Letter of Expectations" which awarded plaintiff one day of back pay, ended the suspension, and cautioned plaintiff about the need to maintain professional, ethical relationships with coworkers.

However, on July 8, 2013, a verbal altercation took place in which plaintiff accused a coworker of lying about having paged him, and shouted that his supervisors were "corrupt" and that "this place sucks." The July 8, 2013 incident was investigated by the University, and after reviewing witness accounts of the incident and plaintiff's disciplinary history, the University terminated plaintiff's employment.

The Union grieved plaintiff's termination pursuant to the terms of his collective bargaining agreement. The grievance was denied and the matter proceeded to arbitration. After a two-day hearing, at which plaintiff was represented by the Union, the arbitrator found that the University had improperly accelerated the disciplinary continuum, and should have placed plaintiff on a disciplinary suspension rather than terminating his employment. The arbitrator ordered that the time that had passed since plaintiff's termination should be considered a disciplinary suspension without pay, and that he should be reinstated – albeit in a different department – after completing an anger management program.

Plaintiff completed the required anger management program, and returned to work on July 31, 2014 as a Unit Support Assistant in the Emergency Department.

On October 2, 2015, plaintiff was walking by a treatment room in the Emergency Department and overheard an exchange between a patient who was resisting being discharged, and two nurses. He apparently attempted to intervene, yelling into the room and asking the patient for his name and other information. Members of the University's Public Safety Department responded and informed plaintiff that he was "not supposed by be in [that] area [of the hospital]." Plaintiff later testified that he believed the patient to be in distress and was attempting to assist. When the University investigated the incident, Emergency Department staff

members stated that they were concerned that plaintiff's actions in asking the patient for information were initiated without a full appreciation of the situation, and could have led to a violation of the Health Insurance Portability and Accountability Act. The University suspended plaintiff with pay during its investigation, and ultimately determined that plaintiff should not be disciplined.

Thereafter, issues arose concerning plaintiff's failure to follow Emergency Department safety procedures concerning patient locations. Patient locations are entered in an electronic medical records system, "eRecord," and are logged whenever a patient is moved from one room to another. In order to prevent misidentification of a patient, hospital staff employ a "double identification" procedure when transporting patients, asking for two pieces of identifying information from the patient (e.g., name and birthdate), and comparing that information with the patient's medical chart in eRecord.

On February 26, 2015, plaintiff recorded in eRecord that a severely ill patient had been moved from the waiting room to a treatment room when in fact he had not, causing a serious delay in that patient's care. Plaintiff was counseled about using the proper procedures for identifying patients and recording patient locations. However, on March 24, 2015, plaintiff was observed by Nurse Manager Betsy Halpin ("Halpin") failing to use the double identification procedure. On March 26, 2015, plaintiff again erroneously recorded a patient as having been transferred to a treatment room when the patient was still in the waiting room. He and several union representatives met with Halpin and other hospital staff to discuss the incident. Although plaintiff claimed that he had not made the incorrect eRecords entry, after investigating the incident, the University determined that plaintiff had made the entry, and suspended plaintiff for

5

five days without pay. The University and the union later entered into an agreement that plaintiff would be transferred to a new position that did not directly involve him in patient care. Plaintiff was thereafter transferred to the position of full-time stock keeper in the Hospital store, at the same rate of pay.

## DISCUSSION

### I. Summary Judgment in Discrimination Cases

Summary judgment will be granted if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Although courts should be cautious about granting summary judgment in cases where motive, intent or state of mind are at issue, a common component of discrimination actions, *see Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988); *Montana v. First Federal Savings and Loan Ass'n of Rochester*, 869 F.2d 100, 103 (2d Cir. 1989), "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to... other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985) (summary judgment rule would be rendered sterile if mere incantation of intent or state of mind would act as a talisman to defeat an otherwise valid motion). *See also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000), (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993) (trial courts should not "treat discrimination differently from other ultimate questions of fact")).

The Court notes that despite being represented by counsel, plaintiff's responses to the pending motions do not include Statements of Material Facts as required by Local Rule 56(a)(2).

Although plaintiff's response in the 2015 case does include a sworn affidavit with exhibits, plaintiff's response in the 2013 consolidated case attaches no evidence in admissible form, but consists of a combination of unsigned and unsworn statements of unclear authorship (and in some cases, bizarre content),[2] and photocopies of unauthenticated documents and correspondence. (13-CV-6290, Dkt. #65, #66, #68, #69). Nonetheless, in the interest of affording the plaintiff every favorable inference, the Court has reviewed all of the material submitted by plaintiff. While the bulk of plaintiff's submissions are not relevant to the bases for the motions before the Court, to the extent that relevant evidence has been presented, the Court has considered it.

## II.  Plaintiff's Claims in the 2013 Consolidated Case

### A.  Discrimination Claims Against the University

Plaintiff's claims of employment discrimination pursuant to Title VII and the NYHRL are subject to the burden-shifting analysis articulated in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, plaintiff must establish a prima facie case of discrimination by demonstrating: (1) membership in a protected class; (2) qualification for, and satisfactory performance in, the job at issue; and (3) an adverse employment action, occurring under (4)

---

2 Plaintiff's responses in each matter purport to identify material questions of fact which bar summary judgment, but are mainly a collection of vague, disconnected statements. For example, plaintiff's response to the motions for summary judgment in the 2013 consolidated case raises the following as alleged issues of material fact: (1) whether plaintiff was "replace[d]" (the position and circumstances are not specified) by a "female, and the sex card [sic] a realized subject, of a past discrimination complaint in Union Grievance(s), Arbitration, complaints"; (2) whether the University engaged in "angry bird discipline" against plaintiff, and improperly "[z]ero[ed] in on the microwave lady potato accusation, with an eye on [a scientific study which allegedly showed that persons in professional positions are 'more sexual [sic] inclined'], [which] begs [sic] a demand for sexual harassment policy define [sic]; [because] this behavior of Plaintiff, is at best, a sexual innuendo, a welcomed gesture, in busy tedious work environs . . . [t]he Dubious Distinction Awards category for Sexual Innuendoes [sic], a necessary nexus, encouraged in delegates and delegations; that are high context [sic] and high work demanding environed [sic]"; (3) whether the University ignored the fact that plaintiff was "so qualified that he has great evaluations, and many awards, with pretty stars on them"; and (4) whether the University has caused plaintiff's "mortgage agreement with Strong [Hospital to be] in Jeopardy [sic]". (13-CV-6290, Dkt. #65 at 2, 3).

7

circumstances giving rise to an inference of discrimination. *See Collins v. New York City Transit Authority*, 305 F.3d 113, 118 (2d Cir. 2002). Once plaintiff has established a prima facie case, the burden shifts to defendant(s) to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). The burden then returns to plaintiff, to supply evidence that the legitimate, nondiscriminatory reason offered by the defendant(s) is pretextual. *See St. Mary's Honor Center*, 509 U.S. 502, 508 (1993).

Plaintiff's complaints in the 2013 consolidated case appear to allege two adverse actions: the June 2013 Final Letter of Expectations and/or the five-day suspension out of which it arose, and plaintiff's July 2013 termination, which was later reversed following arbitration.

With respect to the suspension, which was later converted to the Final Letter of Expectations, plaintiff has failed to produce any evidence that the letter was in fact an adverse employment action; that is, that it caused him to experience "a materially adverse change in the terms and conditions of employment." *See e.g.*, *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012). To the contrary, the Final Letter of Expectations memorialized the University's agreement with the Union to return one day of back-pay to plaintiff and resolve his grievance.

Assuming *arguendo* that the Letter of Expectations was an adverse employment action, and recognizing that plaintiff's termination clearly was, plaintiff has produced no proof by which a reasonable finder of fact could conclude that either event occurred under circumstances giving rise to an inference of discrimination. Indeed, plaintiff himself did not cite racial animus as the reason for these actions when he was deposed, but instead argued, as he does now, that he was treated unfairly due to favoritism and nepotism within the department, and was targeted for

8

discipline because he questioned established protocol and because his work ethic was superior to that of his fellow African-American coworkers.[3]

With respect to the sexual harassment complaints by coworkers that occasioned plaintiff's initial termination, plaintiff does not appear to claim (nor has he produced any evidence to suggest) that those complaints or the University's response were related to his race, either. Rather, he contends that in deciding how to respond to the complaints, the University should have been more understanding of the fact that his employment with the University followed a thirteen-year prison sentence, and that it should have provided him with "anger management[], [and] perhaps, libido management [training]" (13-CV-6290, Dkt. #65 at 3) instead of disciplining him. Such matters have nothing to do with plaintiff's case.

The lack of any correlation between plaintiff's race and the University's actions is further underscored by the fact that although plaintiff alleges that he was treated unfavorably in comparison to other PSAs, he admits that all of the PSAs employed by the University are, like him, African-American. *See Ulrich v. Moody's Corp.*, 2017 U.S. LEXIS 60538 at *39 (S.D.N.Y. 2017) (where alleged comparators in a disparate treatment claim are in the same protected class as plaintiff, any inference of discrimination is negated); *Toussaint v. NY Dialysis Servs.*, 2017 U.S. Dist. LEXIS 14864 at *33 (S.D.N.Y. 2017) ("cases in the Second Circuit have recognized that a plaintiff alleging race discrimination cannot establish that he was terminated in

---

3 Plaintiff's response opposing summary judgment appears to conflate his work ethic with his race, arguing that he was singled out for harassment and unfair treatment by other African-American coworkers and managers, not simply because he was an African-American, but because he was a hard-working African-American, and therefore did not conform to their alleged expectations of him. Plaintiff does not, however, offer any evidence that these same coworkers and managers treated hard-working employees of other races differently from plaintiff. (13-CV-6290, Dkt. #65 at 2).

9

circumstances giving rise to an inference of discrimination where the similarly situated comparators are of the same protected class").

In addition, the person(s) plaintiff identifies as having orchestrated the discriminatory actions against him (chiefly, manager Ernest Myers) are also African-American, again undermining plaintiff's claims that their actions were motivated by racial animus. *See e.g.*, *Meyer v. McDonald*, 2017 U.S. Dist. LEXIS 39766 at *21-*22 (E.D.N.Y. 2017) ("[w]hen the person who allegedly discriminated against plaintiff is a member of the same protected class as plaintiff, the court applies an inference *against* discrimination") (emphasis added) (citing *Palak v. St. Francis Hosp.*, 2015 U.S. Dist. LEXIS 76511 (E.D.N.Y. 2015)). (Dkt. #57-3, plaintiff's deposition at 49-50, 87-88, 101, 124-25, 327, 374, 405-06, 422-24).

Because there is no evidence by which any reasonable finder of fact could conclude that plaintiff was subjected to adverse employment actions under circumstances raising an inference of race-based discrimination, plaintiff has failed to establish a prima face case of discrimination. Even assuming *arguendo* that plaintiff could establish a prima facie case, he has produced no evidence to rebut the University's legitimate nondiscriminatory reasons for its disciplinary actions against plaintiff, consisting of plaintiff's undisputed and well-documented disciplinary history between 2011 and 2013. Plaintiff's discrimination claims against the University are accordingly dismissed.

### B. Discrimination Claims Against the Union

Plaintiff also claims that the Union engaged in race-based discrimination, breaching its duty to provide fair representation with respect to the grievance which challenged plaintiff's five-day suspension and resulted in the Final Letter of Expectations. Specifically, plaintiff

alleges that Union representative Marvin Galloway encouraged one of plaintiff's coworkers to file one of the sexual harassment claims that precipitated the suspension, and that the Union failed to "represent" him by pursuing arbitration of his grievance contesting the suspension, rather than settling it.

With respect to plaintiff's claim that Galloway encouraged or assisted his coworkers in filing sexual harassment claims, it is undisputed that the Union represented those coworkers as well as plaintiff, and that it was obligated to support the rights of any and all of its represented employees to make formal complaints of sexual harassment, even where those complaints were made against others represented by the Union. Plaintiff provides no evidence that the claims with which Galloway assisted were false or discriminatory, and again, does not deny having engaged in the complained-of conduct.

Plaintiff also claims that the Union breached its duty to provide fair representation with respect to his five-day suspension. A union breaches its duty of fair representation when it acts in a manner that is "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190 (1967). It is undisputed that the Union pursued a grievance on plaintiff's behalf, and negotiated a settlement which restored some back pay to plaintiff. It is further undisputed that after plaintiff complained to the Union about Galloway's representation, he was assigned a different Union representative – Tracey Harrison – to assist him. Although plaintiff now complains that the Union should not have settled the grievance but instead proceeded to arbitration, the Union's entry into a settlement that benefited plaintiff was, as a matter of law, within the "wide range of reasonableness" that is permitted to unions in resolving labor disputes. *Desmond v. Retail Clothing Salesmen's Union Local 230*, 1991 U.S. Dist. LEXIS 12946 at *16-*17 (S.D.N.Y.

1991) (where union's decision to enter into a settlement agreement was within a wide range of reasonableness, the union did not breach its duty of fair representation as a matter of law, even if plaintiff disapproved of the settlement); *Dolittle v. Ruffo*, 1991 U.S. Dist. LEXIS 4072 at \*36-\*37 (N.D.N.Y. 1991) (granting summary judgment to the union on breach of fair representation claims, where the union negotiated a settlement favorable to plaintiff, even though plaintiff refused to sign it and believed that the Union should have pursued a grievance instead, because in the absence of evidence of bad faith, even "tactical errors are insufficient to show a breach of the duty of fair representation").

In any event, plaintiff has put forth no evidence that the Union's actions were motivated by discriminatory animus. Moreover, both Galloway and Harrison are, like plaintiff, African-American, which as previously discussed undermines any suggestion that they were motivated by racial bias. *See e.g., Meyer*, 2017 U.S. Dist. LEXIS 39766 at \*21-\*22.

Plaintiff also alleges that the Union failed to adequately represent him in meetings that led up to his [later-reversed] termination, and/or after the termination occurred. However, it is undisputed that Corey Kirkland, a Union representative (and, like plaintiff, an African-American) represented plaintiff at the pre-termination meetings and actively advocated for him. After the termination, the Union filed a grievance on plaintiff's behalf, demanded arbitration when that grievance was denied, and succeeded in obtaining the reversal of plaintiff's termination, and winning his reinstatement.[4] Plaintiff has provided no evidence that the Union

---

4 Although plaintiff complains that he did not receive back pay upon his reinstatement or receive unemployment benefits, he offers no evidence or explanation as to how his failure to receive them resulted from any lapse in Union representation. While the Union represented plaintiff at the arbitration of his termination grievance and his unemployment hearing and advocated for him on both occasions, the ultimate decision of whether to award back pay was within the sole discretion of the arbitrator, and the decision of whether to grant unemployment benefits was made by an Unemployment Administrative Law Judge.

acted in bad faith or otherwise discriminated against him in any way relative to the processing and resolution of his grievances. In light of these undisputed facts, no reasonable factfinder could determine that the Union engaged in race-based discrimination against the plaintiff.

### C. Retaliation Claims Against the University[5]

Retaliation claims are analyzed using the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). On a motion for summary judgment, the plaintiff must first establish a *prima facie* case of retaliation. Once such a showing is made, the burden shifts to the defendant to establish a legitimate, non-retaliatory basis for the complained-of action. If the defendant does so, the burden returns to plaintiff, who must show that the legitimate, non-retaliatory reason articulated by the defendant is a mere pretext, and that retaliation was more likely than not the reason for the complained-of action. *See Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000); *Gallagher v. Delaney*, 139 F.3d 338, 349 (2d Cir. 1998).

A plaintiff makes out a *prima facie* case of retaliation by showing: (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. *Id.*; *Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d 199, 205-206 (2d Cir. 2006).

According to his complaints, plaintiff claims that the University retaliated against him (for unspecified actions) by enacting the 5-day suspension, and that it retaliated against him for his filing of the initial, 2013 lawsuit by terminating his employment on July 10, 2013.

---

5 Plaintiff also vaguely appears to allege retaliation claims against the Union, accusing the Union of "letting" the University terminate his employment and/or subject him to a hostile work environment. However, plaintiff does not allege (let alone produce proof to establish) that there is any basis to hold the Union liable for these alleged acts by the University. Therefore, to the extent that such claims have been sufficiently alleged, they are dismissed.

With respect to the five-day suspension, plaintiff does not identify, nor does either complaint ever allege, that plaintiff engaged in any protected activity prior to his suspension. As such, it cannot form the basis for any claim of retaliation. With regard to the filing of the 2013 action on June 7, 2013, the University avers – and plaintiff does not dispute – that the first notice the University received of that action was on August 15, 2013, when the complaint was served upon it. Because this took place more than a month *after* plaintiff's termination, plaintiff's termination cannot be said to have occurred in response to, or in retaliation for, plaintiff's commencement of the 2013 action.

Moreover, even if plaintiff had established a prima facie case of retaliation, as discussed above, the University has set forth a legitimate, nondiscriminatory reason for its disciplinary actions against plaintiff, including the suspension and the termination of plaintiff's employment, which plaintiff has failed to rebut. *See generally Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (it is well-established that a non-movant cannot defeat summary judgment with "unsupported assertions").[6]

### III. Plaintiff's Claims in the 2015 Case

In attempting to make out a prima facie case of discrimination in the 2015 case, which relates to plaintiff's transfer to the Emergency Department, plaintiff identifies two "adverse actions" which allegedly either resulted from discrimination, or were carried out in retaliation for some protected conduct.

---

[6] Plaintiff's complaints in the 2013 consolidated case also make scattered allegations alluding to a hostile work environment. However, plaintiff offers no allegations or evidence whatsoever concerning any race-based offensive conduct, and as such, to the extent that plaintiff has attempted to allege a hostile work environment claim, that claim is dismissed. While plaintiff also makes reference to a racist voicemail message that was left on his cellular phone account by an unknown male in or around July 2013, he offers no evidence to identify the caller, or to suggest that the voicemail was in any related to, caused by or known to anyone associated with either defendant.

14

### A. October 2014 Temporary Paid Suspension

First, plaintiff claims that his temporary paid suspension during the University's investigation of the October 2, 2014 incident, wherein plaintiff allegedly interfered with the discharge of a patient in the Emergency Department, was discriminatory. In order to demonstrate that it rises to the level of an adverse employment action, plaintiff must show that the paid suspension effected "a materially adverse change in the terms and conditions of his employment." *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 85 (2d Cir. 2015). Generally, "administrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action," *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006), so long as the employer does not take "actions beyond an employee's normal exposure to disciplinary policies." *Perez-Dickson v. Bridgeport Bd. of Educ.*, 2017 U.S. App. LEXIS 1189 at *5-*6 (2d Cir. 2017) (unpublished opinion). Here, plaintiff does not dispute that he continued to be paid his full wages during the investigation, or that the investigation concluded in his favor, and that he returned to his job with no discipline imposed.

Plaintiff offers no evidence that the University took any action beyond the temporary paid suspension, or that the suspension had any negative affect on his employment. As such, the suspension did not constitute an adverse action. *See Brayboy v. O'Dwyer*, 633 Fed. Appx. 557 at 558-59 (2d Cir. 202016) (where there is no evidence that employer's placement of plaintiff on paid leave during an investigation was anything more than "simply appl[ying] reasonable disciplinary procedures to an employee," district court did not err in granting summary judgment) (unpublished decision).

15

Even assuming *arguendo* that plaintiff could make some showing that the paid suspension was an adverse employment action, there is no evidence whatsoever that it was motivated by racial animus. Plaintiff testified that no one else engaged in the same conduct as he on October 2, 2014 (so there are no employees with whom he can be compared on that scale), and has offered no evidence that other employees who engaged in similar altercations were treated any differently. To the extent that plaintiff testified that he believes the paid suspension was imposed in "retaliation" for his having had work-related interpersonal conflicts with staff members in the Emergency Department, such conflicts do not comprise "protected activity" for purposes of establishing a retaliation claim.

As such, no reasonable finder of fact could conclude that plaintiff's temporary paid suspension was an adverse employment action, that it occurred under circumstances suggesting discrimination, and/or that is was causally connected with plaintiff's engagement in protected activity.

### B. March 2016 Suspension and Transfer

Plaintiff also claims that his March 2016 suspension and transfer from the Emergency Department to the Hospital store were discriminatory and/or retaliatory.

Initially, plaintiff has offered no evidence that his transfer to a position with identical pay could be considered an adverse employment action. *See Boza-Meade v. Rochester Housing Authority*, 170 F. Supp. 3d 535, 553 (W.D.N.Y. 2016) (where alleged adverse action is an involuntary transfer, the "key inquiry" is whether the transfer is a "negative employment action tantamount to a demotion"). To the extent that the suspension which preceded the transfer was an adverse employment action (and even assuming *arguendo* that the transfer could be

16

considered an adverse action), plaintiff has failed to offer any evidence that either one occurred under circumstances suggesting discrimination, or was connected with his engagement in protected activity.

Plaintiff theorizes that the March 26, 2015 patient transport incident (involving an incorrect eRecords entry) might have been caused by another African-American administrative employee, whose name plaintiff does not know. Plaintiff speculates that this employee, acting "in cahoots" with nurses who disliked plaintiff, might have stolen plaintiff's account information and deliberately made a false eRecord entry in plaintiff's account to incriminate him. However, plaintiff's contention appears to be nothing more than rank conjecture: he offers no evidence to support the idea that such a charade actually took place, let alone that the alleged participants were in any way motivated by discriminatory animus on account of plaintiff's race. More importantly, plaintiff offers no evidence by which the conduct of his accused coworkers could be imputed to the University, such that its decision to suspend plaintiff in response to the March 26, 2016 incident might be considered discriminatory. As such, no reasonable finder of fact could find that the plaintiff's suspension and transfer following the March 26, 2015 incident were adverse actions that occurred under circumstances suggesting discrimination, and/or that plaintiff has rebutted the University's legitimate, nondiscriminatory reason (plaintiff's failures to follow Emergency Department procedures) for its decision to suspend and transfer plaintiff.

Plaintiff also testified that he believed his suspension and transfer were acts of retaliation for his filing of an EEOC charge against the University on February 3, 2015. However, plaintiff makes no claim that any of the University staff members involved in the investigation of his conduct on March 25, 2015 were aware that an EEOC charge had been filed against the

University. Furthermore, as discussed above, even assuming *arguendo* that pertinent University employees could be presumed to have been aware of the charge, once again, plaintiff has produced no evidence whatsoever to rebut the University's legitimate, nondiscriminatory reason for plaintiff's suspension and transfer – to wit, plaintiff's failures to follow double identification procedures and/or to properly record patient locations in eRecord, both of which undisputedly jeopardized patient safety.[7]

## CONCLUSION

For the foregoing reasons, the defendants' motions for summary judgment (13-CV-6290, Dkt. #55, #56, and 15-CV-6285, Dkt. #25) are granted, and plaintiff's complaints in all three of his pending actions against the defendants (13-CV-6290, 14-CV-6264 and 15-CV-6285) are dismissed in their entirety, with prejudice. [8]

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       May 22, 2017.

---

7 Although plaintiff disputes the contention that he made incorrect eRecord entries, his other alleged failures to follow Emergency Department policies, as well as the University's averments that it followed proper procedures in investigating the March 26, 2015 incident and concluding that plaintiff had in fact made an improper eRecord entry on that date, appear uncontested.

8 The University has also asked that the complaints be dismissed as a penalty for plaintiff's having made – and refused to correct—false statements concerning his earnings in his application to proceed *in forma pauperis*, (15-CV-6285, Dkt. #2), as well as his submission of a fraudulent unsigned affidavit. (15-CV-6285, Dkt. #32 at 3, n.3). The Court is indeed troubled by plaintiff's misrepresentations, particularly given that he is represented by counsel. Given the well-settled preference for addressing matters on their merits and the possibility, however slim, that the errors in question were made carelessly rather than in bad faith, the Court has opted to address the instant motion solely on its merits. The University also notes plaintiff's history of frivolous litigation against the University, and asks the Court to prohibit plaintiff from filing additional actions against the University without leave of Court. That request is denied without prejudice, as such relief must be requested in the form of a separate motion, pursuant to Fed. R. Civ. Proc. 11(c)(2).